UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------X
LANCE MILLER and LARRY RICHARDSON,          :
Individually and on Behalf of All Other Persons  :
Similarly Situated,                          :          **CLASS ACTION**
                                             :          **COMPLAINT**
                        Plaintiffs,          :
            -against-                        :          Case No:
                                             :
NEIL BROZEN, ASBURY CARBONS, INC.,           :
PATRICK SOOK and ASBURY CARBONS, INC. :
EMPLOYEE STOCK OWNERSHIP PLAN                :
                                             :
                        Defendants.          :
-------------------------------------------------------------X

Plaintiffs Lance Miller and Larry Richardson ("Plaintiffs"), individually and on behalf of the other participants and beneficiaries of the Asbury Carbons, Inc. Employee Stock Ownership Plan ("Asbury ESOP" or the "Plan), through counsel, upon personal knowledge as to themselves, and upon information and belief as to all other matters bring this action for damages and other relief against Defendants for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), and allege as follows:

## NATURE OF THE ACTION

1.      Family businesses can be a blessing and a curse. This case is about a family-owned company, Asbury Carbons, Inc. ("Asbury Carbons" or the "Company"), which was founded by Harry M. Riddle in 1895, and which was recently sold to end an intra-family schism among his descendants over the leadership and strategic direction of the Company to the significant benefit of those descendants (the "Riddle family"), but to the significant detriment of Plaintiffs and the other participants in the Asbury ESOP, who, as a result of the sale, have lost approximately 53 percent of the value of their retirement benefits.  In

1

approving this sale, the Defendants, which consist of the Asbury ESOP Trustee and Plan Administrator, breached the fiduciary duties they each owed to the Asbury ESOP participants in violation of ERISA.

2.      The sale of the Company at issue closed on March 24, 2023, and resulted in the acquisition by Mill Rock Capital (a private equity firm) of the Company by means of purchasing all of its outstanding stock for approximately $93,212,984, of which the Asbury ESOP only received $18,371,347.01 for its 19.709 percent stock interest in the Company. The Riddle family held all of the remaining stock in the Company (80.291%). The value of the Plan's holdings of Company stock, pursuant to the last Form 5500 filed with the United States Department of Labor ("DOL") before the Sale, was more than double this amount -- $38,468,559 – and which equated to a Company value of almost $200 million. In addition, internal Company analyses valued the Company at between $150 million to $180 million, and Stephen Riddle, who was previously the Chief Executive Officer of the Company, made an offer to buy the Company for $3,000 per share, which equated to a Company value of approximately $150 million. Further, traditional methods for valuing the Company at or about the time of the sale would have confirmed that the sales price was far below fair value. Ignoring their fiduciary duties to the Asbury ESOP participants, each of the Defendants acted to consummate the directive of the Riddle family to sell the Company as soon as possible Pursuant to this family directive, no alternatives to a sale were pursued and no efforts were made by Defendants to block this significant below fair value sale, even though the Asbury ESOP, with its nearly 20% holdings of the Company's stock, had the ability to do so. Instead, they agreed to it, after a flawed hurry-up sales process and without the benefit of any independent opinion that the offer price was fair to the Asbury

ESOP participants and beneficiaries, and thereby caused the retirement accounts of every Asbury ESOP participant to lose about one-half of their value.

3.     By this action, Plaintiffs seek to on their own behalf, and on behalf of the other Asbury ESOP participants and beneficiaries as of March 24, 2023, to recover the damages the Plan and their retirement accounts have suffered as a result of this markedly below fair value sale, pursuant to ERISA, 29 U.S.C. § 1001 et seq.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

5.     This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process. The principal place of business of Asbury Carbons, which is the Sponsor and Administrator of the Plan, is located at 405 Old Main St., Asbury, NJ

6.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1332(e)(2), because the Plan is administered in this District, and breaches occurred, in whole or in part, in this District, and Defendants either may be found in this District or have transacted business in this District concerning the Asbury ESOP.

## THE PARTIES

### Plaintiffs

7.     Plaintiff Lance Miller is an individual residing in Califon, New Jersey, and has been an employee of the Company for 24 years. Plaintiff Lance Miller has been a

participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the Asbury ESOP at all relevant times.

8.    Plaintiff Larry Richardson is an individual residing in Washington, North Carolina, and has been an employee of the Company and/or its wholly owned subsidiary Asbury Graphite, Inc for 14 years. Plaintiff Larry Richardson has been a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the Asbury ESOP at all relevant times.

**Defendants**

9.    Defendant Neil Brozen ("Brozen") was, at all relevant times, the Asbury ESOP's trustee (the "Trustee"). Brozen is the co-founder and President of Ventura Trust, which provides transactional and ongoing ESOP trustee services to ESOPs across the country as well as consulting services to internal trustees. Defendant Brozen currently serves as a trustee for 145 ESOP companies in 29 states, encompassing various industries such as construction, manufacturing, distribution, and government contractors.  Prior to his appointment as Trustee, H. Marvin Riddle III, Stephen Riddle and others served as the Trustees for the Asbury ESOP.  The Board of Directors of the Company, which served at the behest of the Riddle family (which included Stephen Riddle), given their approximately 80 percent ownership stake in the Company, had the power to and did authorize this change and also had the power to remove Defendant Brozen if the Riddle family was dissatisfied with his actions on behalf of the Asbury ESOP.

10.    As Trustee, Brozen owed fiduciary duties under ERISA to the Plan participants.  In violation of those fiduciary duties, Brozen agreed to sell all of the Plan assets (its shares in the Company) to facilitate the sale of the Company to Mill Rock

4

Capital for the sole benefit of the Riddle Family, which sale halved the value of the retirement accounts of the Plan participants and beneficiaries.

11.    Defendant Brozen was sued by the Secretary of the United States Department of Labor ("DOL") on October 29, 2001, for the same breaches of fiduciary duty under ERISA alleged herein.  In *Walsh v. Neil Brozen and others*, Case 3:22-cv-01869-E (N.D. Tex.), the DOL has alleged that Brozen violated his fiduciary duties under ERISA to the participants in the RVNB Holdings, Inc. ESOP by agreeing to sell all of the company stock held by that ESOP, as a part of the sale of the company, for grossly inadequate consideration.  In that case, the DOL alleges the ESOP stock company holdings to have been worth between $44.8 million to $58.2 million, yet Brozen agreed to sell them for $12.5 million.

12.    Defendant Asbury Carbons was, at all relevant times, the Asbury ESOP Plan Administrator and Plan Sponsor. As Plan Administrator, Asbury Carbons had discretionary authority with regard to the administration and management of the Plan, including the operation of the Plan, and exercised that authority.  As the May 2022 Summary Plan Document for the Plan states, "ERISA imposes duties upon persons who are responsible for the operation of the ESOP," who are "fiduciaries of the Plan" and therefore "have the duty to administer the Plan prudently and in the sole interest of … the Plan Participants and beneficiaries."  Defendant Asbury Carbons appointed senior financial officers of the Company to perform its Plan Administrator responsibilities -- specifically M. Susan Rish (Executive V.P. for finance) for at least the fiscal 2020 Plan Year and then Defendant Patrick Sook (the Company's Chief Financial Officer) the Plan years thereafter.

13.     Defendant Patrick Sook ("Sook") was the Chief Financial Officer of the Company during all relevant periods, who also served as the Company's appointed Plan Administrator during all relevant periods.  Sook had discretionary authority with regard to the administration and management of the Plan, including the operation of the Plan, and exercised that authority.  As a result, Sook also owed a fiduciary duty to administer the Plan prudently and in the sole interest of the Plan Participants and beneficiaries. Defendants Asbury Carbons and Sook are referred to collectively as the "Plan Administrator Defendants."  Defendant Sook has retained his position as CFO of the Company following the Mill Rock Capital acquisition of the Company,

14.     The Asbury ESOP, which has been terminated as a condition of the sale to Mill Rock Capital, was an employee benefit plan as defined by ERISA section 3(3), 29 U.S.C. § 1002(3), and was subject, at all relevant times, to coverage under ERISA pursuant to section 4(a)(1) of ERISA, 29 U.S.C. § 1003(a)(1).  The Plan covered substantially all employees of the Company and participating subsidiaries of Asbury Carbons, Inc., namely Asbury Graphite Mills, Inc.; Anthracite Industries, Inc.; Asbury Graphite, Inc. of California; Cummings-Moore Graphite Company; Asbury Louisiana, Inc.; and Asbury Graphite of North Carolina who have completed one year of service and attained age twenty-one. There is a written instrument of the Asbury ESOP, within the meaning of ERISA § 402, 29 U.S.C. § 1102, by which the Plan has been maintained during the relevant period.  The most recent version of this written instrument is dated as of May 2022 ("Plan Document").  A Summary Plan Description of that Plan Document was also created to provide to Plan participants if they requested the Plan Document. (the "May 2022 Summary Plan Description").  The Asbury ESOP is named as a nominal defendant

pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely if necessary to assure that complete relief can be granted.

## FACTUAL ALLEGATIONS

### Asbury Carbons and the Riddle family

15.     Since the Company's founding in 1895 by Harry M. Riddle, the Company has been majority owned by the Riddle family (which consist of H. Marvin Riddle III, Stephen Riddle and his two sisters), which during all relevant times owned 80.3 percent of the Company's stock.  Asbury Carbons has been for some time North America's largest processor and supplier of natural and synthetic graphite and cokes and the world's largest independent processor of graphite. Asbury Carbons sources these materials globally and operates 12 facilities in which the Company processes and distributes a broad range of application-specific materials and additives to customers' exacting performance requirements. Asbury Carbon's products are used in polymers and rubbers, paints and coatings, lubricants, specialty ceramics, friction products, insulation, and other materials.

16.     At the time of the sale to Mill Rock Capital, Asbury had a long history of being a very successful company that experienced consistently, in recent years, annual sales in the range of $160 to $200 million, and annual profits in the range of $15 to $20 million. The Company also had significant growth potential and had no debt.

17.     In an April 14, 2022, letter by Defendant Sook to Retirement Plan Participants, in which he explained the reason for a delay in providing an Annual Statement to Plan participants, he stated:

> The shares of Asbury stock held in the ESOP were previously valued at $2,390 per share as of June 30, 2020, and $3,747 as of June 30, 2021.  Since then, the Company's performance has been strong, which will be reflected in your next ESOP statement.

Defendants, however, agreed to sell the Plan's holdings of Company shares for only $1,759.87 per share.

18.     The direct descendants of Harry M. Riddle have always led the Company. His great-great grandson, H. Marvin Riddle III had long headed the Company but due to failing health gave up day-to-day responsibilities for the Company to his son, Stephen Riddle, who became President in 1995.  H. Marvin Riddle III remained as Chairman of the Board until November 2018, when he had Stan Tilton, who is a Leadership Development Coach/Mentor and Career Strategist, replace him as Chairman.  H. Marvin Riddle III had previously retained Stan Tilton to coach his son Stephen Riddle in leadership skills, when he became Chief Executive Officer ("CEO") of the Company.

19.     Stephen Riddle became CEO in 2005 but due to growing disagreements with other Riddle family members as to his leadership of the Company and his lack of efforts to grow the Company, on April 17, 2020, Stephen Riddle, at the insistence of his family, stepped down from all day-to-day responsibilities for the Company, remaining with the Company only as a Director and significant shareholder.

20.     Following this resignation, no one was appointed to succeed Stephen Riddle as CEO, leaving Noah Nichelson ("Nichelson") to run the Company as President, and marking the first time ever in the Company's long history that a member of the Riddle family had not been at the helm of the Company.

21.     Nichelson joined the Company in 2015 as Chief Operating Officer and became President in 2016. Nichelson has retained his position as President of the Company following the sale to Mill Rock Capital.  Nichelson was also a member of the Board of the Company at all relevant times.

22.    An Executive Committee was then formed by the Board to explore the strategic direction of the Company going forward. The members of this committee were: Stan Tilton, Nichelson, Steve Polgar (Vice President of Operations), Kevin Meister (Vice President of Sales), and Lewis Fish (Vice President, Business Development & Key Accounts, until June 2022, when he retired from the Company).  In the course of their work, the Executive Committee determined that the Company was worth $150 million to $180 million.

23.    Later that year, Stephen Riddle, undaunted in his belief he should be running the Company, determined to take control of the entire Company by making an offer to purchase all of the shares he did not own for $3,000 per share, which offer valued the overall Company at approximately $150 million.

24.    His offer, however, was rejected by the Executive Committee on the grounds it valued the Company at too low a price (as it was at the low end of their valuation of the Company earlier that year) and because Stephen Riddle had not demonstrated that he could obtain the financing to consummate such an acquisition.  Frustrated by the rejection of his offer, sometime before the end of 2020, he made it widely known within the Company that he had offered to purchase the Company for $3,000 per share and that his offer had been rejected.

**The Decision to Sell the Company by the Riddle Family**

25.    Disputes between Stephen Riddle and his family about his leading the Company again continued to foment and by the summer of 2021 reached the point that the Riddle family determined that the only way to avoid a schism in the family was to sell the Company, which sale, they knew, would require the sale of all of the Riddle family's

holdings of Asbury Carbons stock as well as all of the Asbury ESOP's holdings of Asbury Carbons stock.

26.    Accordingly, in August 2021, Tilton, who had a close relationship with Marvin Riddle III, on behalf of the Riddle family, informed the Executive Committee that the Riddle family wanted the Company sold as soon as a sale could be accomplished. There was no other reason to initiate a sale of the Company at this time: Asbury Carbons was thriving, as the overwhelming dominant player in the supply and processing of graphite in North America and the world's largest independent processor of graphite, with consistently strong financial results, and no debt.

27.    To implement the Riddle family's decision to sell the Company, the Executive Committee's responsibility for investigating all strategic options for the Company was terminated and reassigned by the Board to a newly formed Strategic Initiative Committee, but that Committee was charged with only one initiative – facilitating the sale of the Company. The members of the Strategic Initiative Committee were: Tilton, who was acting on behalf of the Riddle family, Nichelson, and M. Susan Rish, Executive Vice President of Finance and former officer responsible for the functions of the Plan Administrator.  There was therefore not a single independent person on this Strategic Initiative Committee. Although Ms. Rish retired from the Company in late 2021, she continued in her role as a member of this Committee as a paid consultant by the Company and remained in that role until the sale to Mill Rock Capital closed in March 2023.

28.    The Strategic Initiative Committee determined to hire Deloitte Corporate Finance to facilitate the Riddle family's sale directive. Deloitte Corporate Finance was

given no task other than to sell the Company and was not asked to prepare any valuation of the Company before or during their solicitation of bids.

29.    Once bids were received, they were quickly winnowed down to two bidders – Unimetal Group, which is a major producer of carbon related products in South America, and Mill Rock Capital, after having preliminary discussions with each of them.

30.    In the second half of 2022, Mill Rock Capital then provided a sweetened bid of more than $105 million. Unimetal Group, however, was only given a few days, over a weekend, to submit a new sweetened bid.  When they didn't over the three days they were given, Mill Rock Capital was given exclusivity to conduct due diligence.

31.    Once Mill Rock was given exclusivity, the Executive Committee was then charged with participating in that due diligence.  Given the exclusivity afforded to Mill Rock Capital, the Company was not free to entertain any further offers.

32.    During the course of that due diligence process, Mill Rock Capital kept lowering their offers, citing deteriorating financial considerations in the financial markets generally.  Defendants Brozen and Sook knew of these lowered offers.

33.    Also, during this due diligence process, members of the Executive Committee went to the Board of Directors of the Company and advocated that, given the deterioration in financial markets in the second half of 2022, the Company not be sold at that time.  The Board of Directors at the time consisted of Stephen Riddle, Tilton, Nichelsen, William T. Meglaughlin (a former CFO of the Company), and J. Clark O'Donoghue (an attorney), all of whom (except for Stephen Riddle) served at the pleasure of the Riddle family. The Board rejected this effort to put off the sale.  The Board did not deviate from the Riddle family's directive to sell the Company as soon as was possible.

34.    Mill Rock Capital ultimately would only pay approximately $98 million to purchase all the shares held by the Riddle family and the Asbury ESOP.  Despite their knowledge that the general financial markets were continuing to deteriorate, which directly impacted the price at which Mill Rock Capital was willing to buy the Company, the sale was approved by the Board and Defendant Brozen, and with the complicity of the Plan Administrator Defendants, all to effectuate the Riddle family's determination to sell the Company as quickly as was possible.  Defendant Brozen's approval on behalf of the Asbury ESOP and the Plan Administrator Defendants approval of a sale which required the sale of all of the Asbury ESOP's holdings of its shares in the Company and consummation of the sale of the Plan's shares in the Company were contrary to the interests of Plaintiffs and the Class defined below.

35.    This sales process was also flawed.  In addition to not affording Unimetal Group a reasonable time to improve its offer, neither the Strategic Initiative Committee nor the Executive Committee consisted of any independent members and neither they, nor the Company or Board, sought any opinion from any firm as to whether the Mill Rock Capital offer was fair to the Asbury ESOP, as they should have.  For these reasons, and the other reasons set forth herein concerning a proper valuation of the Company, the sale price cannot be considered to represent as affording a fair value for the Asbury ESOP shares.

36.    Defendants approved and facilitated this below-value sale in total disregard of their fiduciary duties under ERISA to act solely for the benefit of the Asbury ESOP participants and beneficiaries.

**Defendants Agreed to Sell the ESOP Holdings of Company Shares In
Disregard of Independent Valuations of those Shares and Without Obtaining
an Independent Opinion that the Sale Price was Fair to Plan Participants**

37.    Defendants Brozen and the Plan Administrator Defendants were responsible for providing Summary Annual Reports following each fiscal year end (June 30) to all ESOP participants and beneficiaries reflecting their interests in the Plan.  To determine the value of the Asbury ESOP Company share holdings as of June 30 each year, Defendants employed the services of the Schwartz Heslin Group ("SHG"), which offers strategic advisory, investment banking, and comprehensive business valuation services.  SHG's valuation of the Asbury ESOP Company shareholdings was conducted using a market and income approach.  A market approach to valuation of a private company is the guideline transactions method, which is based on valuation multiples derived primarily from merger & acquisition transactions involving companies similar to the subject company.  An income approach to the value of any business is directly related to the present value of all future cash flows that the business is reasonably expected to produce.  The income approach requires estimates of future cash flows and an appropriate rate at which to discount those future cash flows.  This approach typically involves a discounted cash flow analysis.

38.    As of June 30, 2020, the annual statements provided by Defendants to Asbury ESOP participants and beneficiaries, which were based on SHG's valuation of the Asbury ESOP's holdings of Company shares, stated the Net Asset Value of the ESOP was $25,204,972.  This Net Asset Value was based on SHG's determination that the value of the Asbury ESOP's interest in the Company's stock had a fair value of $26,182,450.  This annual statement was provided to Asbury ESOP participants by the January following the end of the Plan year, as was the practice in prior Plan years.

13

39.     Defendants were also responsible for the filing of Annual Return/Report of Employee Benefit Plan on Form 5500 with the DOL, which reflected SHG's valuations. The 2019 Form 5500 for the period July 1, 2019, through June 30, 2020, was signed by the Company's Executive Vice President of Finance, M. Susan Rish, who was also a member of the Strategic Initiative Committee.  This Form 5500 reflected the same $25,204,972 Net Asset Value as was provided to Plan participants and beneficiaries in December 2020 and that the estimated fair value of the Plan's holdings of Company stock was $26,182,450.

40.     As of June 30, 2021, the annual statements provided by Defendants to Asbury ESOP participants and beneficiaries, which were based on SHG's valuation of the Asbury ESOP's holdings of Company shares, stated the Net Asset Value of the ESOP was $38,468,559.  This Net Asset Value was based on SHG's determination that the value of the Asbury ESOP's interest in the Company had grown to a fair value of $39,115,445. That statement, however, was not provided to Asbury ESOP participants until May 24, 2022, instead of four months earlier as was the prior practice.

41.     Defendant Brozen was aware of Defendant Sook's April 14, 2022, letter to Plan participants which explained the reason for this delay, and which also stated that "the Company's performance has been strong" since June 30, 2021.

42.     The 2020 Form 5500 for the period July 1, 2020, through June 30, 2021, was signed by the Company's then Chief Financial Officer, Defendant Sook, as Plan Administrator.  It reflected the same $38,468,559 Net Asset Valuation as was provided to Plan participants in December 2021 and that the estimated fair value of the Plan's holdings of Company stock was $39,115,455.

43.     Defendants also did not provide a Summary Annual Report to Asbury ESOP participants and beneficiaries for the fiscal year ended on June 30, 2022, by January 2023. Instead, on March 29, 2023, Defendant Brozen wrote all Asbury ESOP participants and beneficiaries and advised them that the ESOP had sold its shareholdings and received sale proceeds of $18,371,347.01 for its 19.709 percent interest in the Company's stock -- representing a shocking 52 percent decline in the value of their retirement accounts from the June 30, 2021, valuation Defendants had provided to them and a 42 percent decline in a December 30, 2021 interim valuation that Defendants provided to them.  Neither Defendant Brozen nor the Plan Administrator Defendants have provided any explanation that would justify $18,371,347.01 as a fair valuation to sell all of the Asbury ESOP's holdings.

44.     Nevertheless, Defendants agreed to the terms of the sale to Mill Rock Capital which resulted in a significant reduction of the Asbury ESOP Plan participants and beneficiary retirement accounts.

45.     Defendants also did not seek to obtain an independent opinion as to the fairness of the proposed sale price to Plan participants and beneficiaries, as they should have.  Had they tried to obtain such a fairness opinion, no reputable firm would have opined that the sale price was fair to such persons.

46.     Given the approximately 20% stake in the Company held by the Asbury ESOP, the ESOP had the ability to block the sale but failed to do so even though it would result in Asbury ESOP participants losing over 50% of the value of the retirement benefits.

47.     The 2021 Form 5500 for the period July 1, 2021, through June 30, 2022, was not filed with the DOL until April 18, 2023, which was after the sale to Mill Rock Capital closed on March 24, 2023. It was also signed by Defendant Sook as Plan Administrator.  This after the fact filing, was made in an attempt to retroactively support

the Defendants' approval of the significantly below fair value sale of the Plan's holdings of Company shares.

48.     This April 18, 2023, Form 5500, which only addresses the Plan year ending June 30, 2022, asserts without any basis whatsoever, and contrary to Defendant Sook's April 14, 2022 letter in which he states "the Company's performance has been strong," that the value of the ESOP Company shareholdings precipitously dropped to $19,091,191, a decline of $20,024,264 from June 30, 2021, and an amount which is an amount that is only about 4 percent more than the $18,371,347.01 amount of proceeds received by the Plan from the March 2023 sale of its Asbury stockholdings.  Additionally, the accounting report on which this valuation was made was not signed until April 18, 2023. This was a sham, after the fact, filing by Defendants.

49.     Defendant Sook knew or should have known of the Executive Committee's $150 – 180 million valuation and of Defendant Stephen Riddle's own offer valuing the Company at $150 million.  Further, as a Chief Financial Officer, Defendant Sook also knew or should have known that the sales price represented an earnings multiple of approximately 4.65 and that an appropriate earnings multiple for the sale of a stable profitable company no debt, such as the Company, was, at the time, more than double that.

50.     Neither Brozen nor the Plan Administrator Defendants objected to the sale of the Plan's shares to Mill Rock Capital or take any steps to prevent it, such as refusing to sell the Plan's Company shareholdings at the offer price.  In doing so, the Defendants acted solely in furtherance of the Riddle family's determination to sell the Company, and to the determinant of the retirement accounts of the Asbury ESOP participants and beneficiaries.

**Defendants Knew The Sale Was Agreed to At an Extremely Disadvantageous
Time to Sell the Company**

51.    During the due diligence process described above, Mill Rock Capital kept

lowering its proposed offer price citing a deterioration in the financial markets.  In fact, as

reported by Bain & Company, a top management consulting firm which advises corporate

leaders on strategy, marketing, organization, operations, IT and M&A, across all industries:

> The year 2022 was a tale of two halves. After a blockbuster year for M&A
> in 2021, the first five months of 2022 reflected continued strong dealmaking
> activity. The big turning point occurred on June 16, 2022, when an interest
> rate hike by the US Federal Reserve Bank, combined with heightened
> macroeconomic uncertainty, put a chill on the deal market. Megadeals
> greater than $10 billion went on pause while smaller deals slowed. Deal
> multiples tempered. The midyear correction resulted in a 36% decline in
> annual M&A deal value, to $3.8 trillion (see Figures 1 and 2). After a strong
> first half of 2022, the market slowed in the second half.

https://www.bain.com/insights/looking-back-at-2022-m-and-a-report-2023/

52.    Mill Rock Capital's offers were therefore not representative of the fair value

of the Company's shares, which Defendants knew or should have known.  Nevertheless,

they made no effort to stop the sales process or the acceptance of Mill Rock Capital's offer,

and instead agreed to consummate the Riddle Family's directive to sell the Company as

soon as was possible, to the substantial determent of the retirement accounts of the Plan

participants and beneficiaries.

**Defendant Brozen Failed to Provide Plan Participants and Beneficiaries a Vote
on the Acquisition, as Required by the Asbury ESOP**

53.    The May 2022 Summary Plan Description describes the rights Plan

participants and beneficiaries have to voice their views on a sale of the Company:

> As a Plan participant you may direct the Trustee as to how to vote the shares
> of Company stock held in your ESOP account with respect to the approval
> or disapproval of any corporate merger or consolidation, recapitalization,
> reclassification, liquidation, dissolution, or sale of substantially all Company

<u>assets.</u> The Trustee will provide a ballot for you if such matters arise. In
such case, the Trustee will vote your shares according to your instructions.

Emphasis added.

54.    This provision is not qualified by any condition that there be a vote of all
shareholders on such transactions.  Defendant Brozen breached his fiduciary duties to the
Plan participants and beneficiaries by approving the sale to Mill Rock Capital on his own
without, as required, putting the issue up to a vote of the Plan participants and beneficiaries.

**The Riddle Family and Stephen Riddle Achieve Their Objectives**

55.    On March 28, 2023, Nichelson wrote to all Asbury Carbons employees to
inform them of the <u>Riddle family's sale</u> of the Company to Mill Rock Capital.

56.    As a result of the consummation of their directive to sell the Company, the
Riddle family, which includes Stephen Riddle, ended their schism and received almost $75
million from the sale, which was likely all profit to them as the Company shares they
owned were initially acquired in 1895 at likely one cent per share and benefited from a step
in basis with the passing of the Riddle stock from generation to generation.  In contrast, the
Asbury ESOP participant accounts have collectively lost over $20 million.

57.    Stephen Riddle has also received an additional benefit from the sale -- a
continued role in the Company without having to deal with his family over the Company's
management.

<strong>CLASS ACTION ALLEGATIONS</strong>

58.    Plaintiffs bring the foregoing causes of action on behalf of the following
class pursuant to Fed. R. Civ. P. Rule 23(b)(1) (the "Class"):

> All Participants and Beneficiaries in the Asbury Carbons,
> Inc. Employee Stock Ownership Plan as of March 24,
> 2023, other than any Defendant.

59.     Class certification of Plaintiffs' Claims for Relief for violations of ERISA is appropriate pursuant to Fed. R. Civ. P. Rule 23(b)(1). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and beneficiaries and to act solely in the best interests of the Plan and its participants and beneficiaries. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Asbury ESOP and all participant and beneficiary accounts as a whole. As a result, the prosecution of separate actions by individual Class members would create the risk of inconsistent adjudications that would establish incompatible standards of conduct relating to the Plan.

60.     The Class is so numerous that the joinder of all members is impracticable. According to the most recent Form 5500 for the period ended June 30, 2022, filed April 23, 2023, there were, at the time, 205 Participants in the Plan.

61.     The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on whether Defendants' acts (or failures to act) breached the fiduciary duties they owed to Plaintiff and the members of the Class.  Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

a)     Whether Defendants breached their fiduciary duties to Plaintiffs and the Class by causing the Asbury ESOP and the accounts of its participants and beneficiaries to receive inadequate consideration from the sale of the Plan's assets to Mill Rock Capital;

b)     Whether Defendant Brozen breached his fiduciary duties to the

Plaintiffs and Class in failing to provide a ballot to them to vote on whether the

Plan should sell all its Company stockholdings to Mill Rock Capital;

c)     Whether Defendants caused the Plan to engage in a prohibited

transaction in connection with the sale of Plan Assets to benefit the Riddle

family;

d)     Whether the losses suffered by the Asbury ESOP are a result of the

Defendants' ERISA violations; and

e)     The appropriate relief for Defendants' violations of ERISA.

62.     Plaintiffs' claims are typical of those of the Class because their claims arise

from the same events, practices and/or course of conduct.

63.     Plaintiffs will fairly and adequately represent and protect the interests of the

Class.

64.     Plaintiffs do not have any interests antagonistic to or in conflict with the

interests of the members of the Class.

65.     Plaintiffs have retained counsel competent and experienced in complex class

actions, ERISA, and employee benefits litigation.

**FIRST CAUSE OF ACTION:**
**Breach Of Fiduciary Duty Under ERISA §404(a)(1)(A),(B) & (D)**
**(on Behalf of Plaintiffs and the Class against All Defendants)**

66.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 65 as

if they were set forth again herein.

67.     The Asbury ESOP May 2022 Summary Plan Description names the persons

who operate the Plan are "fiduciaries of the Plan" who "have the duty to administer the

plan prudently and in the sole interest of you and other Plan participants and beneficiaries."

Defendant Brozen and the Plan Administrator Defendants were responsible for operating

and exercised discretionary authority over the management of or assets of the Plan.

68.     According to the U.S. Department of Labor:

> The Employee Retirement Income Security Act (ERISA) protects your plan's assets by requiring that those persons or entities who exercise discretionary control or authority over plan management or plan assets, anyone with discretionary authority or responsibility for the administration of a plan, or anyone who provides investment advice to a plan for compensation or has any authority or responsibility to do so are subject to fiduciary responsibilities. <u>Plan fiduciaries include, for example, plan trustees, plan administrators,</u> and members of a plan's investment committee.

https://www.dol.gov/general/topic/retirement/fiduciaryresp (emphasis added).

69.     Defendant Brozen was therefore, at all relevant times, a fiduciary of the

Asbury ESOP pursuant to ERISA sections 3(21)(A)(i) and (iii), 29 U.S.C. §§

1002(21)(A)(i) and (iii).

70.     The Plan Administrator Defendants, therefore, at all relevant times, were

fiduciaries of the Asbury ESOP pursuant to ERISA sections 3(21)(A)(i) and (iii), 29 U.S.C.

§§ 1002(21)(A)(i) and (iii).

71.     ERISA §404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a fiduciary

discharge his or her duties with respect to a plan <u>solely</u> in the interest of the participants and

the beneficiaries, (A) for the <u>exclusive</u> purpose of providing benefits to participants and

beneficiaries of the ESOP,  (B) with care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like

aims., and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

72.    The duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the participant receives adequate consideration for the assets in his or her account in the Plan.  Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market, means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

73.    The Plan required each account to "be valued at the end of every Plan Year (July 1)" and specified that "The value of Asbury Carbons, Inc. shares is determined each year by the Trustee in consultation with an independent appraiser."

74.    Defendants did not act prudently, loyally, or in good faith, and did not conduct an appropriate investigation, in allowing and agreeing to, and in doing nothing to prevent, the sale of the Asbury ESOP holdings of nearly 20 percent of the Company shares for grossly inadequate consideration.

75.    Defendant Brozen breached his fiduciary duties under ERISA §§ 404(a)(1)(A) and 404(a)(1)(B) by, among other things (a) failing to timely obtain well-prior to the acquisition, an independent valuation of the Company shares held by the Plan as of June 30, 2022; (b) agreeing to a sale of the Plan's 20 percent stake in the Company for a value that he knew or should have known was significantly less than the fair value of the Company stock; (c) agreeing to the sale of Plan shares in the Company to Mill Rock Capital when he knew or should have known that the state of the financial market for

22

selling a company such as Asbury in the second half of 2022 was markedly deteriorating; (d) agreeing to the sale to Mill Rock Capital without obtaining an opinion from an independent firm that the Mill Rock Capital proposed purchase price was fair to the Plan participants and beneficiaries, all of which should have caused him not to participate in any way in the sale of the Company at this time, which sale the Plan could have blocked given the size of the Plan's Company stock holdings.

76.    Defendant Brozen approved the sale of the Asbury ESOP assets for grossly inadequate consideration, in part, to portray himself as willing to acquiesce in a company's plans in order to maintain his existing clients and secure additional ESOP clients.

77.    Each of the Plan Administrator Defendants had a conflict of interest which precluded them from acting solely in the interests of the Plan participants and beneficiaries. The Company was acting under the directive of the Riddle family to sell the Company as soon as was possible and Defendant Sook, as the CFO, of the Company was acting in furtherance of that directive.  In addition, Defendant Sook was further conflicted as the Mill Rock Capital offer included his retention as CFO following the acquisition.  As a result, the Plan Administrator Defendants did not act prudently or loyally in allowing and/or facilitating the sale of the Asbury ESOP holdings of nearly 20 percent of the Company shares for grossly inadequate consideration.

78.    The Plan Administrator Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A) and 404(a)(1)(B) by, among other things (a) failing to timely obtain well-prior to the acquisition, an independent valuation of the Company shares held by the Plan as of June 30, 2022; (b) agreeing to a sale of the Plan's 20 percent stake in the Company for a value that they knew or should have known was significantly less than the

fair value of the Company stock; (c) agreeing to the sale of Plan shares in the Company to

Mill Rock Capital when they knew or should have known that the state of the financial

market for selling a company such as Asbury in the second half of 2022 was markedly

deteriorating; (d) agreeing to the sale to Mill Rock Capital without obtaining an opinion

from an independent firm that the Mill Rock Capital proposed purchase price was fair to

the Plan participants and beneficiaries, all of which should have caused the Plan Participant

Defendants not to participate in any way in the sale of the Company at this time, which sale

the Plan could have blocked given the size of the Plan's Company stock holdings.

79.    As a result of the breaches of fiduciary duty described in this Cause of

Action, Defendant Brozen and the Plan Administrator Defendants caused losses to the Plan

accounts of Plaintiffs and the members of the Class and the Plan, for which they are liable

pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a).

**SECOND CAUSE OF ACTION:**
**Breach Of Fiduciary Duty Under ERISA §404(a)(1) (D)**
**(On Behalf of Plaintiffs and the Class against Defendant Brozen)**

80.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 79 as

if they were set forth again herein.

81.    ERISA §§ 404(a)(1)(D) requires that a fiduciary discharge his or her duties

with respect to a plan solely in the interest of the participants and the beneficiaries, and "in

accordance with the documents and instruments governing the plan insofar as such

documents and instruments are consistent with ERISA."

82.    Defendant Brozen breached his fiduciary duties under ERISA § 404(a)(1)(D)

by failing to provide Plan participants and beneficiaries with a ballot by which they could

indicate whether they favored or opposed the sale of the Company shares held by the Plan to Mill Rock Capital.

83.    As a result of the breach of fiduciary duty described in this Cause of Action, Defendant Brozen caused losses to the Plan accounts of Plaintiffs and the members of the Class and the Plan, for which they are liable pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a).

**THIRD  CAUSE OF ACTION:**
**Engaging in a Prohibited Transaction Forbidden by ERISA §406(b)**
**(On Behalf of Plaintiffs and the Class against All Defendants)**

84.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 79 as if they were set forth again herein.

85.    ERISA § 406(b)(2) mandates that "a fiduciary with respect to a plan shall not" "(2) in his individual capacity or in any other capacity act in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the plan or the interests of its participants."

86.    Defendant Brozen was a fiduciary of the Plan at all relevant times.

87.    Each of the Plan Administrator Defendants were fiduciaries of the Plan at all relevant times.

88.    By agreeing to sell all of the Plan's holdings in Asbury stock at a price that was far below the fair value of those shares so that the Riddle family, which had interests adverse to the Plan and the accounts of Plan participants and beneficiaries, Defendants violated ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) and caused losses to the retirement accounts of Plaintiffs and the Class members.

**FOURTH CAUSE OF ACTION:**
**For Co-Fiduciary Liability under 29 U.S.C 1105(a)(2)**
**(On Behalf of Plaintiffs and the Class against all Defendants)**

89.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 88 as if they were set forth again herein.

90.    Defendant Brozen and the Plan Administrator Defendants are also liable as fiduciaries for the fiduciary breaches of their co-fiduciaries under ERISA section 405(a), which makes a fiduciary "liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . (1) if he participates knowingly in . . . an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. §§ 1105(a)(1), (2), and (3).

91.    As set forth above, Defendants Brozen and the Plan Administrator Defendants knew that the sale to Mill Rock Capital was for grossly inadequate consideration, that the sales process which led to the sale to Mill Rock Capital of the Asbury ESOP Company shares for grossly inadequate consideration was flawed, and that no opinion was obtained demonstrating that the sale price was fair to the Asbury ESOP and to the accounts of Plan participants and beneficiaries. Yet, they did not take any action to prevent or remedy the sale to Mill Rock Capital. As a result, Defendant Brozen and the Plan Administrator Defendants "participate[d] knowingly" in the breaches of each other's

fiduciary duties to the Asbury ESOP and are jointly and severally liable for these breaches pursuant to ERISA section 405(a)(1), 29 U.S.C. § 1105(a)(1).

92.     Despite knowing that Defendant Brozen and the Plan Administrator Defendants had breached fiduciary duties to the Asbury ESOP as set forth above, they failed to make reasonable efforts to fully remedy the breaches and are jointly and severally liable for each other's breaches pursuant to ERISA section 405(a)(3), 29 U.S.C. § 1105(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

1. Require Defendants to jointly and severally make good to the Asbury ESOP, or to the account in which the sale proceeds received by the Plan have been deposited, the losses resulting from their breaches of fiduciary duties, as alleged herein;

2. Declare this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

3. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1) and/or ordering reasonable attorneys' fees and expenses of this action to Plaintiffs' Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class in this action;

4. Require Defendants to pay pre-judgment interest and post-judgment interest; and

5. Grant such other relief as the Court determines may be equitable, just and proper.

Dated: May 9, 2023                          By:  /s Seth R. Lesser
                                            Seth R. Lesser
                                            Jeffrey A. Klafter*
                                            KLAFTER LESSER LLP
                                            Two International Drive, Suite 350
                                            Rye Brook, New York 10573
                                            E-mail: seth@klafterlesser.com
                                            jak@klafterlsesser.com
                                            Telephone: (914) 934-9200
                                            www.klafterlesser.com

                                            Michael A. Galpern
                                            Javerbaum Wurgaft Hicks Kahn Wikstrom
                                            and Sinins, P.C.
                                            1000 Haddonfield-Berlin Road, Suite 203,
                                            Voorhees, NJ 08043
                                            www.lawjw.com
                                            E-mail: mgalpern@lawjw.com
                                            Telephone: (856) 596-4100

                                            * to be admitted *Pro Hac Vice*

                                            **ATTORNEYS FOR PLAINTIFFS**