**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

LANCE MILLER and LARRY RICHARDSON, Individually and on Behalf of All Other Persons Similarly Situated,

Plaintiffs,

v.

NEIL BROZEN, ASBURY CARBONS, INC., PATRICK SOOK and ASBURY CARBONS, INC. EMPLOYEE STOCK OWNERSHIP PLAN,

Defendants.

Civ. Action No. 3:23-cv-02540-PGS-DEA

**Motion Day: November 6, 2023**
**Document Electronically Filed**
**Oral Argument Requested**

**ASBURY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .....1
II. RELEVANT FACTUAL BACKGROUND .....5
A. Asbury and the Plan .....5
B. The Mill Rock Transaction .....8
III. ARGUMENT .....11
A. Governing Legal Standards .....11
B. Plaintiffs Lack Article III Standing to Assert Their Claims .....14
C. The Asbury Defendants Were Not Acting in a Fiduciary Capacity in Connection with the Mill Rock Transaction .....17
D. Plaintiffs Fail to Plead Co-Fiduciary Liability .....24
IV. CONCLUSION .....25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................13

*Ass'n of N.J. Chiropractors, Inc. v. Data iSight, Inc.*,
2022 WL 45141 (D.N.J. Jan. 5, 2022)....................18, 23

*Ballentine v. United States*,
486 F.3d 806 (3d Cir. 2007)....................12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................13

*Brown v. Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010)....................17

*Burke v. Boeing Co.*,
42 F.4th 716 (7th Cir. 2022)....................14, 21, 22, 23

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)....................5

*Const. Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014)....................14

*Danza v. Fid. Mgmt. Tr. Co.*,
2012 WL 3599362 (D.N.J. Aug. 20, 2012)....................5

*Danza v. Fid. Mgmt. Tr. Co.*,
533 F. App'x 120 (3d Cir. 2013)....................23

*Davis v. FEC*,
554 U.S. 724 (2008)....................13

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013)....................18

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)....................13, 24

*FOCUS v. Allegheny Cty. Ct. of Common Pleas*,
75 F. 3d 834 (3d Cir. 1996) ....................................................................13

*Gotha v. United States*,
115 F.3d 176 (3d Cir. 1997) ....................................................................5

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*,
768 F.3d 284 (3d Cir. 2014) ....................................................................23

*Lance v. Coffman*,
549 U.S. 437 (2007)....................................................................................14

*Leckey v. Stefano*,
501 F.3d 212 (3d Cir. 2007) ....................................................................14

*Livick v. Gillette Co.*,
492 F. Supp. 2d 1 (D. Mass. 2007)...........................................................23

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................................................................................13

*In re Merck & Co., Inc., Sec. Deritative & Erisa Litig.*,
2006 WL 2050577 (D.N.J. July 11, 2006) ..........................................23, 25

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
549 F.2d 884 (3d Cir. 1977) ......................................................................5

*Mugnai v. Kirk Corp.*,
843 F. Supp. 2d 858 (N.D. Ill. 2012).........................................................23

*PBGC v. White Consol. Indus.*,
998 F.2d 1192 (3d Cir. 1993) ....................................................................5

*Pegram v. Herdrich*,
530 U.S. 211 (2000).....................................................................3, 14, 18, 19

*Perrone v. Johnson & Johnson*,
2020 WL 2060324 (D.N.J. Apr. 29, 2020)..................................................25

*Pietrangelo v. NUI Corp.*,
2005 WL 1703200 (D.N.J. July 20, 2005) ..................................................5

*In re RCN Litig.*,
2006 WL 753149 (D.N.J. Mar. 21, 2006) ....................................................22, 25

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011) ....................................................................19, 25

*Spokane v. Nationwide Life Ins. Co.*,
617 F. Supp. 3d 290 (E.D. Pa. 2022)..............................................................19

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................14, 15

*Srein v. Frankford Tr. Co.*,
323 F.3d 214 (3d Cir. 2003) ........................................................................19

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013) ........................................................................13

*Storino v. Borough of Point Pleasant Beach*,
322 F.3d 293 (3d Cir. 2003) ........................................................................12

*Taylor v. KeyCorp*,
680 F.3d 609 (6th Cir. 2012) ........................................................................17

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020)..................................................................................15

*Wheeler v. Travelers Ins. Co.*,
22 F.3d 534 (3d Cir. 1994) ..........................................................................12

*In re Wilmington Tr. Corp. ERISA Litig.*,
943 F. Supp. 2d 478 (D. Del. 2013)................................................................17

**Statutes**

ERISA Section 3(3), 29 U.S.C. § 1002(3)..............................................................6

ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A)....................................3, 18, 19

ERISA Section 404(a), 29 U.S.C. § 1104(a) ......................................................3, 17

ERISA Section 405(a), 29 U.S.C. § 1105(a) ....................................................24, 25

ERISA Section 405(c), 29 U.S.C. § 1105(c) ....................................................20, 25

ERISA Section 406(b)(2), 29 U.S.C. § 1106(b)(2) ................................4, 17, 18, 24

**Rules**

Fed. R. Civ. P. 12(b)(1)...........................................................................3, 5, 11, 12

Fed. R. Civ. P. 12(b)(6)..................................................................................3, 5, 13

**Other Authorities**

U.S. Const. art. III, § 2, cl. 1 .........................................................................11

# I. INTRODUCTION

Plaintiffs Lance Miller and Larry Richardson ("Plaintiffs") are former participants in the Asbury Carbons, Inc. Employee Stock Ownership Plan (the "Plan"), an employee stock ownership plan ("ESOP"). The Plan allowed employees of Asbury Carbons, Inc. ("Asbury" or "the Company") to obtain beneficial ownership of Asbury common stock. During the relevant period, the Plan held 19.7% of outstanding Asbury common stock, while the remaining 80.3% was owned by the Riddle family, who founded the Company in 1895. In March 2023, Mill Rock Capital (a private equity firm) purchased Asbury, including all outstanding Asbury common stock (the "Mill Rock Transaction"). The sale of the Plan's stock was approved on behalf of the Plan by the Plan's independent trustee and special fiduciary, Neil Brozen ("Defendant Brozen").

Plaintiffs bring this lawsuit against Asbury, its Chief Financial Officer, Patrick Sook (together, the "Asbury Defendants"), and Defendant Brozen (collectively, "Defendants"), under the Employee Retirement Income Security Act ("ERISA"). In their Complaint, Plaintiffs claim Defendants violated their fiduciary duties (Count I) and engaged in a prohibited transaction (Count III) by permitting the sale of the Plan's Asbury stock to Mill Rock Capital for below fair market value.[1]

[1] The Complaint asserts an additional fiduciary-breach claim against Defendant Brozen for his alleged failure to provide Plan participants an opportunity to vote on the sale of the Plan's stock in the Mill Rock Transaction (Count II). *See* Compl.

Plaintiffs allege that Mill Rock Capital paid $93.2 million—or $1,759.87 per share—for all outstanding Asbury common stock, with a proportional amount ($18.37 million) being paid to the Plan for its shares. Compl. ¶¶ 2, 56. According to Plaintiffs, however, the fair market value of the Company was between $150 million to $180 million—or $3,000 per share. *Id.* ¶¶ 2, 22-23, 49. Plaintiffs allege that, as a result of the Company's undervaluation, Plan participants lost over $20 million in share value. *Id.* ¶ 56.

Plaintiffs' theory rests on the implausible contention that the Riddle family, as the founders and majority owners of Asbury, directed the sale of their own company for well below fair market value, resulting in *a self-inflicted loss of between $45 million and $70 million*. The Complaint offers no plausible, non-conclusory allegations explaining why the Riddle family would act contrary to their own self-interest by selling the Company at an enormous personal loss, let alone why any of the Defendants would be motivated to assist them. But even setting aside this conceptual failing, the Court should dismiss the Complaint because it fails to state a viable claim.

To start, Plaintiffs lack Article III standing to proceed with this suit. The Complaint hinges on the notion that the Plan should have received at least $3,000

¶¶ 80-83. Because Plaintiffs do not assert Count II against the Asbury Defendants, it is not addressed in this Motion.

per share for Asbury common stock through the Mill Rock Transaction. But the Plan—including Plaintiffs—received *more* than that. As explained in documents and communications available to Plaintiffs at the time they filed this lawsuit (but as conveniently left out of their Complaint), they will receive at least ***$3,031 per share*** comprising cash payments and dividends connected to the sale of Asbury. This means Plaintiffs did not suffer any injury-in-fact under their own theory of the case. Put another way, even measured by the Complaint's own allegations, Plaintiffs received fair market value for their shares of Asbury stock as part of the Mill Rock Transaction. Therefore, Plaintiffs lack standing and their claims should be dismissed under Rule 12(b)(1).

Moreover, even if Plaintiffs could establish Article III standing, the Court should dismiss Plaintiffs' claims against the Asbury Defendants pursuant to Rule 12(b)(6). In every fiduciary-breach case, "the threshold question is . . . whether [a] person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Thus, to state a claim for fiduciary breach under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), Plaintiffs must plausibly allege that the Asbury Defendants exercised fiduciary discretion over the Plan in connection with the Mill Rock Transaction. *See* 29 U.S.C. § 1002(21)(A) (providing in relevant part that a person is a fiduciary to the extent they exercise discretionary authority over the management

of a plan or disposition of its assets). Similarly, to state a prohibited-transaction claim under Section 406(b)(2), Plaintiffs must allege the Asbury Defendants were "a fiduciary with respect to [the] plan." 29. U.S.C. § 1106(b)(2).

Plaintiffs do not and cannot meet this basic pleading requirement. The Asbury Defendants did not exercise any discretion over the sale of the Plan's assets, nor does the Complaint allege that they took any specific actions on behalf of the Plan as part of the Mill Rock Transaction. Rather, the Plan's independent trustee and special fiduciary, Defendant Brozen, had sole discretion over the Plan's assets and sole authority to approve the sale of those assets on behalf of the Plan. In short, the Asbury Defendants were not fiduciaries to the Plan in relation to the Mill Rock Transaction, and they cannot be liable under ERISA for alleged fiduciary breaches or prohibited transactions related to that transaction. Moreover, Plaintiffs cannot state a cause of action for a prohibited transaction because ERISA Section 406(b)(2) prohibits fiduciaries from acting on behalf of *an adverse party* as part of a transaction involving plan assets, whereas Plaintiffs allege only that the Asbury Defendants acted on behalf of the *Plan itself*. In other words, because the Complaint does not allege the Asbury Defendants acted on behalf of an adverse party, their prohibited-transaction claim also fails as a matter of law.

For these reasons and those set forth below, the Court should dismiss Plaintiffs' claims against the Asbury Defendants in their entirety and with prejudice.

## II. RELEVANT FACTUAL BACKGROUND[2]

### A. Asbury and the Plan

Asbury is one of North America's largest processors and suppliers of natural and synthetic graphite. Compl. ¶ 15. Since its founding in 1895, Asbury has been majority owned by the Riddle family. *Id.* The Plan was established by Asbury for

---

[2] This summary comes from Plaintiffs' allegations or documents referenced in the Complaint. In deciding motions under Rule 12(b)(6), the Court may consider "document[s] integral to or explicitly relied upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted), or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Relevant here, the Court may properly consider the following exhibits: the Plan Document and 2021 Adoption Agreement (Exs. 1 and 2, referenced at Compl. ¶ 14), and Defendant Brozen's Trust Agreement, Fiduciary Services Agreement, and Addendum to Fiduciary Services Agreements (Exs. 3, 4, and 5, referenced at Compl. ¶¶ 9, 10). *See Pietrangelo v. NUI Corp.*, 2005 WL 1703200, at *3 (D.N.J. July 20, 2005) (considering plan documents at motion to dismiss "in determining whether Plaintiff has sufficiently alleged Defendants' fiduciary status."); *Danza v. Fid. Mgmt. Tr. Co.*, 2012 WL 3599362, at *2 (D.N.J. Aug. 20, 2012) (considering trust agreement because it was "[a] document that form[ed] the basis of [plaintiff's] claim"), *aff'd*, 533 F. App'x 120 (3d Cir. 2013). Further, in reviewing a factual challenge to the Court's subject-matter jurisdiction under Rule 12(b)(1), the Court is not confined to the complaint, and the presumption of truthfulness does not attach to the complaint's allegations. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). Relevant here, the Court may properly consider the Declaration of Patrick Sook (Ex. 6) and the following exhibits to Mr. Sook's Declaration: a participant communication dated April 14, 2022, concerning the $900 dividend ("Participant Communication") (Sook Decl. Ex. A), and a letter to participants by Defendant Brozen regarding the Mill Rock Transaction and the $243 dividend dated March 29, 2023 ("Brozen Letter") (Sook Decl. Ex. B).

the benefit of its employees under ERISA Section 3(3), 29 U.S.C. § 1002(3), and its assets were composed primarily of shares of Asbury common stock. *Id.* ¶ 14. Participants in the Plan accrued Company-stock benefits in their individual Plan accounts. *Id*. During the relevant period, the Plan held 19.7% of outstanding Asbury common stock (or 9,728 shares), while the remaining 80.3% was owned by the Riddle family. *Id.* ¶ 2.

Like other ESOPs, the Plan has a plan document that governs the terms and conditions of its administration and the benefits for its participants. Compl. ¶ 14. The plan document in effect during the relevant period was adopted and restated as of July 1, 2021 (the "Plan Document"). *Id.*; Ex. 2, 2021 Adoption Agrmt. Under the Plan Document, Asbury, as the employer and sponsor of the Plan, was the Plan's "Named Fiduciary." Ex. 1, Plan Document, § 2.43. As the Named Fiduciary, Asbury designated a Plan Administrator to oversee certain aspects of the day-to-day administration of the Plan. *Id.* at §§ 2.43, 2.48. During the relevant period, Mr. Sook was the designated Plan Administrator. Ex. 2, 2021 Adoption Agrmt., § J. Under the Plan Document,

> [t]he Plan Administrator shall have exclusive discretionary responsibility and authority to control and manage the operation and administration of the Plan, including the interpretation and application of its provisions, ***except to the extent such responsibility and authority are otherwise specifically (a) allocated to the Company or the Trustee under the Plan or Trust Agreement***, ***(b) delegated to other persons by the Company, the Plan Administrator, or the Trustee, or (c) allocated to another party by operation of law.*** The Plan Administrator shall

have no investment responsibility with respect to the Trust Fund.

*Id.* at § 10.1 (emphasis added).

Under the Plan, Asbury had the power to designate a Trustee for the Plan. *Id.* §§ 2.67, 11.1. During the relevant period, Defendant Brozen was the Plan's designated Trustee. Compl. ¶¶ 9-10. Pursuant to Section 11 of the Plan, "[t]he Trustee shall be ***a fiduciary with respect to the management and control of Trust Assets*** and shall have exclusive responsibility for the investment thereof in accordance with the Trust Agreement[.]" Ex. 1, Plan Document, at § 11.4 (emphasis added). Pursuant to the trust agreement between Asbury and Defendant Brozen (the "Trust Agreement"), Defendant Brozen had the specific power to "***to sell, transfer, convey, exchange or otherwise dispose of" any investment held in the trust***, "and no person dealing with the Trustee shall be under any duty to inquire as to the validity, expedience, or propriety of any such sale or as to the application of the purchase money paid to the Trustee." Ex. 3, Trust Agrmt., § 2.3(d) (emphasis added). Because responsibility for the management, sale, and transfer of Plan assets was specifically allocated to Defendant Brozen as the Trustee, the Plan Administrator was not responsible for those activities under the express terms of the Plan Document. Ex. 1, Plan Document, § 10.1.

Defendant Brozen also acted as Special Fiduciary to the Plan pursuant to a separate agreement dated December 13, 2021. Ex. 4, Fiduciary Servs. Agrmt. Under

the Plan, the Special Fiduciary has "***the sole power and authority to negotiate the terms of any transaction whereby the Trust acquires or disposes of Company Stock***[.]" Ex. 1, Plan Document, § 11.4 (emphasis added). In August 2022, in light of the impending sale transaction between Asbury and Mill Rock Capital, Defendant Brozen's Fiduciary Services Agreement was amended to include additional services in relation to the Plan specific to the Mill Rock Transaction. The amendment provided that Defendant Brozen "***shall evaluate the relative and absolute fairness of the financial terms and conditions of the Transaction***" and "shall divest of employer securities to the extent the Trustee, in his ***sole and absolute discretion***, determines that such investment is prudent and consistent with his fiduciary responsibilities under ERISA." Ex. 5, Add. to Fiduciary Servs. Agrmt., Sch. 1 (emphasis added).

### B. The Mill Rock Transaction

The Mill Rock Transaction closed on March 24, 2023, and Mill Rock Capital acquired Asbury and all outstanding Asbury common stock. Compl. ¶ 2. The sale included all 9,728 shares of Asbury common stock held in the Plan. *Id.* As part of the sale, the Plan was terminated and participants were compensated for the Asbury common stock held in their individual Plan accounts. *Id.* ¶ 14. Under the Trustee Agreement and the Special Fiduciary Agreement, Defendant Brozen had sole discretion to evaluate the fairness of the Mill Rock Transaction on behalf of the Plan

and to approve the sale of the Plan's common stock. *See supra* at 6-8.

Instead of receiving a single lump-sum payment in exchange for the Asbury shares held in their individual Plan accounts, participants received payments in two different forms. First, participants received a share of the cash proceeds from the Mill Rock Transaction related to the Plan's 19.7% stake that totaled $18,371,347, or **$1,888.50 per share**. Ex. 6, Sook Decl., at ¶ 5; Sook Decl. Ex. B at 1.[3] Second, Asbury distributed two special dividends to Asbury shareholders related to the Mill Rock Transaction. As part of the transaction, Mill Rock Capital purchased Asbury's assets, including any cash held by the Company. Ex. 6, Sook Decl. at ¶¶ 7-9. Therefore, Asbury's fair market valuation as approved by Defendant Brozen and the total purchase price paid by Mill Rock Capital for the Company necessarily reflected the cash Asbury held at the time of the purchase. *Id*. Leading up to the transaction, Asbury held a surplus of cash. *Id.* at ¶ 8. The Company decided to issue dividends for the specific purpose of distributing that cash to shareholders and thereby decreasing Asbury's cash on hand before its purchase by Mill Rock Capital. *Id*. Had Asbury not used the Company's surplus cash to issue dividends to Asbury

[3] Plan participants will receive their share of the $18,371,347 cash proceeds in two distributions. Participants received a distribution form on June 12, 2023. Upon executing and returning the distribution form, participants receive 75% of their share of the proceeds. They will receive the remaining 25% on the later of (i) the date on which the Internal Revenue Service issues a favorable determination letter regarding the continued tax qualification of the Plan, or (ii) by the end of 2025. Ex. 6, Sook Decl., at ¶¶ 6-7; Sook Decl. Ex. B at 2.

shareholders, that cash would have remained an asset of the Company and Mill Rock Capital would have paid a higher price to purchase Asbury reflecting those additional cash assets. *Id*. Instead of Mill Rock Capital purchasing the excess cash (which would have required Mill Rock to secure additional financing to pay the higher purchase price), Asbury distributed the excess cash *directly to shareholders* (including Plan participants) in the form of special dividends. *Id.* at ¶¶ 8-9; Sook Decl. Exs. A and B. Had the Company not done so, participants would have received equivalent dividend amounts as part of the cash proceeds from the transaction. *Id*.

On December 22, 2021, Asbury paid a special dividend to Asbury common stock shareholders of **$900 per share**. Ex. 6, Sook Decl. at ¶ 10; Sook Decl. Ex. A.[4] The $900 per-share dividend was disclosed in a letter to Plan participants from Mr. Sook dated April 14, 2022, and dividends were distributed to Plan participants in May and June 2022. *Id*. This was the first time in the Company's history that a dividend was paid to Asbury shareholders, and it was a direct result of the impending sale of the Company and the effort to lessen the company's cash assets pre-sale. *Id*.

[4] As explained in Defendant Brozen's motion to dismiss (Section IV), the Plan's publicly filed 2021 Form 5500 reflects that the Company distributed a portion of its surplus cash to shareholders through the $900-per share dividend in 2022 (totaling $8.7 million). Thus, the value of the Plan's stock holdings did not "precipitously drop" in 2022 without any explanation as Plaintiffs allege (*see* Compl. ¶ 48), but rather the value of the Plan's shares reflected the distribution of $8.7 million in dividends. The Asbury Defendants adopt and incorporate Section IV of Defendant Neil Brozen's Memorandum of Law in Support of His Motion to Dismiss.

On March 10, 2023, Asbury declared a second dividend of **$243 per share**. Ex. 6, Sook Decl. at ¶ 11; Sook Decl. Ex. B, at 3. This dividend was disclosed to Plan participants in a letter from Defendant Brozen dated March 29, 2023, and distributed in June 2023. *Id.* Together, the two dividends totaled an additional **$1,143 per share**. Sook Decl. at ¶ 12. All told, Plan participants—including Plaintiffs—will receive at least ***$3,031 per share*** for their Asbury stock as a result of the Mill Rock Transaction, as described below:[5]

| **Source of Payment** | **Total Payment Amount** | **Per-Share Payment Amount** |
|---|---|---|
| Cash Proceeds | $18,371,347.00 | $1,888.50 |
| 2022 Dividend | $8,755,200.00 | $900.00 |
| 2023 Dividend | $2,363,904.00 | $243.00 |
| **TOTAL** | **$29,490,451.00** | **$3,031.50** |

## III. ARGUMENT

### A. Governing Legal Standards

***Rule 12(b)(1).*** Article III limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Motions to dismiss for lack of standing are "properly brought pursuant to Rule 12(b)(1), because standing is a

[5] In addition to $3,031 per share in cash proceeds and dividends, Plan participants also may receive funds currently held in several escrow accounts to be released following certain defined holding periods related to the closing of the Mill Rock Transaction. Ex. 6, Sook Decl. at ¶ 13; Sook Ex. B at 1-2. Although these escrow funds—which totaled more than $2.89 million as of March 29, 2023—are described in documents provided to Plaintiffs before the filing of this lawsuit, the Complaint makes no mention of them. *Id.*

jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). If a plaintiff lacks standing to assert his or her cause of action, the court does not have "subject matter jurisdiction to address the merits of [the] plaintiff's case." *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003) (citation omitted). The standing requirement is essentially a test to "ensure that plaintiffs have a 'personal stake' or 'interest' in the outcome of the proceedings" that is "sufficient to warrant [the court's] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on their behalf." *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537-38 (3d Cir. 1994) (internal quotation marks, alterations and internal citations omitted).

To establish standing, a plaintiff must satisfy both the "case and controversy" requirements of Article III of the United States Constitution and certain other factors known as "prudential requirements." *Wheeler*, 22 F.3d at 537. Under Article III, the plaintiff must "show that he [or she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Id.* (alteration original). The injury in question "must be concrete and capable of being redressed by the court should the plaintiff prevail on the merits." *Id.*

Pursuant to Rule 12(b)(1), the plaintiff "'bears the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner

and degree of evidence required at the successive stages of the litigation.'" *FOCUS v. Allegheny Cty. Ct. of Common Pleas*, 75 F. 3d 834, 838 (3d Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

***Rule 12(b)(6).*** In assessing ERISA claims under Rule 12(b)(6), courts must apply the settled pleading standards from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Rule 12(b)(6) is an "important mechanism for weeding out meritless claims" in the ERISA context. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Among other reasons, this is because "the prospect of discovery" in these cases is "ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*St. Vincent*"), 712 F.3d 705, 718-19 (2d Cir. 2013) (citation omitted). Further, the Supreme Court has emphasized that "Congress sought to encourage the creation of ESOPs," and courts must not apply pleading standards that discourage ESOPs by exposing employers to potentially meritless litigation. *Dudenhoeffer*, 573 U.S. at 424.

To state a claim for breach of fiduciary duty or a prohibited transaction under ERISA, a plaintiff must allege that "(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225–

26 (3d Cir. 2007). If a defendant was not "acting in a fiduciary capacity at the time he, she, or it took the actions that are the subject of the complaint," the court should dismiss the complaint. *Burke v. Boeing Co.*, 42 F.4th 716, 724 (7th Cir. 2022) (citing *Pegram*, 530 U.S. at 226; additional citation omitted).

### B. Plaintiffs Lack Article III Standing to Assert Their Claims

Even before turning to the legal insufficiency of Plaintiffs' allegations, the Court can and should dismiss the Complaint because Plaintiffs lack constitutional standing to pursue their claims. Crucially, Plaintiffs do not plead any injury-in-fact that would give them standing because they do not allege the total consideration paid to the Plan and its participants as a result of the Mill Rock Transaction was inadequate or below fair market value. Instead, Plaintiffs received $3,031 per share for their Asbury common stock, above the amount they allege was the stock's per-share fair market value at the time. Ex. 6, Sook Decl. at ¶ 12; Sook Exs. A and B.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-41 (2016). "The standing inquiry . . . focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). As

the Supreme Court has confirmed, "[t]here is no ERISA exception to Article III" and its standing requirements. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).

The "irreducible constitutional minimum of standing consists of three elements." *Spokeo*, 578 U.S. at 338. A plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. The injury-in-fact element requires a showing that a plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (citations omitted). The mere filing of a class action "adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Id*. at 338 n.6. Applied here, these principles confirm that Plaintiffs do not and cannot establish Article III standing to pursue their claims.

Plaintiffs do not allege that Defendants miscalculated the number of shares allocated to their accounts within the Plan, or that Defendants failed to make payments to redeem certain shares held by Plaintiffs. Instead, Plaintiffs contend solely that Defendants did not ensure the Plan received adequate consideration for the shares of Asbury common stock it held when the Company was purchased by Mill Rock Capital. Plaintiffs assert that the fair market value of the Company at the

time of the Mill Rock Transaction was between $150 million to $180 million—or $3,000 per share. Compl. ¶¶ 2, 22-23, 49. For example, Plaintiffs allege that "internal Company analyses valued the Company at between $150 million to $180 million" around the time of the sale. *Id.* ¶ 2. They also allege that Defendants were aware that "Stephen Riddle, who was previously the Chief Executive Officer of the Company, made an offer to buy the Company for $3,000 per share, which equated to a Company value of approximately $150 million." *Id.* Plaintiffs assert that "Defendant Sook knew or should have known of the . . . $150-180 million valuation and of [Mr. Riddle's] own offer valuing the Company at $150 million," but failed to object to the sale of Asbury stock for less. *Id.* ¶¶ 49-50. In short, Plaintiffs' alleged injury rests entirely on the premise that the fair market per-share value of Asbury's common stock at the time of the sale was $3,000, and that Plaintiffs received less.

As described above, Plan participants—including Plaintiffs—will have received at ***a minimum $3,031 per share*** by the time all proceeds from the Mill Rock Transaction have been paid out. *See supra* 8-11. As Plaintiffs acknowledge, the Plan received $18,371,347 in cash proceeds from the sale, *see* Compl. ¶ 2, which amounts to $1,888.50 per share. Combined with the stock dividends issued in 2022 and 2023—totaling an additional $1,143 per share—Plan participants will be compensated $3,031 per share, well within the range of the Company's fair market value according to Plaintiffs' own allegations. Ex. 6, Sook Decl. at ¶¶ 5-12; Sook

Decl. Exs. A and B. The fact that participants received a portion of their share value by way of stock dividends—instead of through cash proceeds (as Plaintiffs focus on)—does not change this analysis. In the end, Plaintiffs will receive more than $3,000 per share for their Asbury stock, which aligns with the $150 million company valuation the Complaint alleges was fair. Because Plaintiffs did not suffer any injury-in-fact under their own theory of the case, they lack Article III standing to sue, and the Court should dismiss the Complaint. *See, e.g.*, *In re Wilmington Tr. Corp. ERISA Litig.*, 943 F. Supp. 2d 478, 487 (D. Del. 2013) (finding plaintiffs who were "net sellers" of company stock during the class period lacked Article III standing because they suffered no "actual injury."); *Taylor v. KeyCorp*, 680 F.3d 609, 615 (6th Cir. 2012) (same); *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010) (same).

### C. The Asbury Defendants Were Not Acting in a Fiduciary Capacity in Connection with the Mill Rock Transaction

Plaintiffs assert that the Asbury Defendants breached the fiduciary duties of prudence and loyalty under ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), and violated ERISA's prohibited-transaction provision under Section 406(b)(2), 29 U.S.C. § 1106(b)(2),[6] by failing to object to the Mill

[6] Section 406(b)(2) provides that "[a] fiduciary with respect to a plan shall not . . . in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of

Rock Transaction and allowing the Plan's Asbury stock to be sold for below fair market value. These fiduciary-breach and prohibited-transaction claims may be asserted only against a party that is a fiduciary within the meaning of ERISA. *See Ass'n of N.J. Chiropractors, Inc. v. Data iSight, Inc.*, 2022 WL 45141, at *4 (D.N.J. Jan. 5, 2022) ("Section 502(a) only permits suits . . . as to fiduciaries of the plan"); *see also Pegram*, 530 U.S. at 226 (describing fiduciary status as a "threshold question"). Because Plaintiffs concede that Defendant Brozen assumed fiduciary authority over the Plan's assets and had sole discretion to approve the Mill Rock Transaction on behalf of the Plan, they fail to plausibly allege that the Asbury Defendants were acting as ERISA fiduciaries in connection with the transaction, and the Court should dismiss these claims.

ERISA provides in relevant part that a person or entity is an ERISA fiduciary only "*to the extent* he . . . exercises any discretionary authority or discretionary control respecting" the management of a plan, its assets, or its administration. 29 U.S.C. § 1002(21)(A) (emphasis added). Thus, "ERISA defines a fiduciary 'in functional terms of control and authority over the plan,' or in other words, in terms of who performs particular functions." *Data iSight, Inc.*, 2022 WL 45141, at *4 (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013));

---

the plan or the interests of its participants or beneficiaries . . ." 29 U.S.C. § 1106(b)(2).

*see also Pegram*, 530 U.S. at 225-26 (ERISA "does not describe fiduciaries simply as administrators of the plan, or managers or advisers. Instead it defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan.").

Further, "[i]t has been well said that '[f]iduciary status under § 1002(21)(A) is not an all or nothing concept . . . [A] court must ask whether a person is a fiduciary with respect to *the particular activity in question*." *Srein v. Frankford Tr. Co.*, 323 F.3d 214, 221 (3d Cir. 2003) (emphasis added). "Thus, Defendant may be a fiduciary for one of the alleged acts of discretionary authority or control but lack fiduciary status for another." *Spokane v. Nationwide Life Ins. Co*., 617 F. Supp. 3d 290, 298 (E.D. Pa. 2022). A fiduciary who wears two hats—as a corporate fiduciary and an ERISA fiduciary—"wear[s] only one at a time[.]" *Pegram*, 530 U.S. at 225.

For the Asbury Defendants to be liable as ERISA fiduciaries, Plaintiffs must plead that they engaged in fiduciary acts by exercising discretionary control over "the particular activity in question"—i.e., the sale of the Plan's assets in connection with the Mill Rock Transaction. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011). Here, the Complaint does not allege that Asbury or Mr. Sook took any specific actions on behalf of the Plan related to the sale of Asbury stock to Mill Rock Capital. Further, Plaintiffs do not (and cannot) allege that the Asbury Defendants had any power or authority to negotiate the terms of the Mill Rock Transaction or

determine the sale price that Mill Rock paid for the Company's stock.

As part of their authority, named fiduciaries such as Asbury and Mr. Sook may designate an individual or entity to carry out certain fiduciary responsibilities. *See* 29 U.S.C. § 1105(c)(1). The Plan Document provides that the Plan Administrator's "discretionary responsibility and authority" regarding certain actions may be "allocated" to "the Trustee under the Plan or the Trust Agreement," thus relieving the Plan Administrator of any responsibility regarding the delegated actions. Ex. 1, Plan Document, at § 10.1. As Plaintiffs acknowledge, Defendant Brozen was designated the Plan's Trustee during the relevant period. *See* Compl. ¶ 9. Further, Defendant Brozen was designated the Plan's Special Fiduciary and assumed authority on behalf of the Plan related to the sale of the Plan's assets. Ex. 5, Addendum to Fiduciary Servs. Agrmt., Sch. 1. Together, the Plan Document, Defendant Brozen's Trustee Agreement, and the Fiduciary Services Agreements confirm that Defendant Brozen alone had *sole discretion* to evaluate and approve the Mill Rock Transaction on behalf of the Plan, and that Asbury and Mr. Sook delegated any discretionary authority over the Plan's assets they might have had to Defendant Brozen. *See* Ex. 1, Plan Document, at § 11.4; Ex. 3, Trust Agrmt., § 2.3(d); Ex. 5, Addendum to Fiduciary Servs. Agrmt., Sch. 1.

To start, the Trust Agreement gave Defendant Brozen the authority as Trustee to "***to sell, transfer, convey, exchange or otherwise dispose of***" any investment held

in the Plan. Ex. 3, Trust Agrmt., § 2.3(d) (emphasis added). It also provided that "no person dealing with the Trustee shall be under any duty to inquire as to the validity, expedience, or propriety of any such sale or as to the application of the purchase money paid to the Trustee." *Id.* The Plan gave Defendant Brozen as Special Fiduciary "***the sole power and authority to negotiate the terms of any transaction whereby the Trust acquires or disposes of Company Stock***[.]" Ex. 1, Plan Document, § 11.4 (emphasis added). Further, the amended Special Fiduciary Agreement—which Asbury and Defendant Brozen entered into for the specific purpose of the Mill Rock Transaction—provided that Defendant Brozen "shall ***evaluate the relative and absolute fairness of the financial terms and conditions of the Transaction***" and "shall divest of employer securities to the extent the Trustee, in his ***sole and absolute discretion***, determines that such investment is prudent and consistent with his fiduciary responsibilities under ERISA." Ex. 5, Addendum to Fiduciary Servs. Agrmt., Sch. 1 (emphasis added).

The delegation to Defendant Brozen of authority to make decisions about the Mill Rock Transaction on behalf of the Plan stops Plaintiffs' claims dead in their tracks. Plaintiffs allege that Asbury and Mr. Sook had conflicted interests and failed to act in the best interests of the Plan—but the delegation of their authority to Defendant Brozen anticipated exactly this sort of conflict. Indeed, the Seventh Circuit in *Burke* recently affirmed dismissal of ERISA claims asserted against the

plan administrator and fiduciary committee of an ESOP where the defendants had delegated authority to an independent fiduciary (like Defendant Brozen) regarding the ESOP's company stock. 42 F.4th at 732-33. The court observed that "[t]he delegation was designed to remove the dilemma that plaintiffs' theory would force upon corporate insiders who exercise fiduciary responsibilities over ERISA plans invested in the employer's stock," noting that "where company insiders who manage ESOPs are willing to give up control to avoid potential conflicts between duties under ERISA and their duties under corporation and federal securities laws, we see no legal obstacles." *Id.* at 728, 733.

The same is true here. Asbury engaged Defendant Brozen as Trustee and Special Fiduciary, and delegated to him full fiduciary authority over the Plan's assets and the sale of those assets, precisely to avoid the conflict Plaintiffs now allege. In other words, the Asbury Defendants "step[ped] aside in favor of [a] new, independent fiduciar[y] who [could] focus exclusively on the interests of ERISA plan participants and beneficiaries." *Id.* at 720. This means that "in order to impose fiduciary responsibility for the management of the Plan's assets on [the Asbury] Defendants, the Plaintiffs would need to allege that these defendants, either through the use of their positions or otherwise, caused [Defendant Brozen] to relinquish [his] independent discretion in deciding" whether to sell the Plan's assets. *In re RCN Litig.*, 2006 WL 753149, at *8 (D.N.J. Mar. 21, 2006). The Complaint offers no

such allegations.

Because the Asbury Defendants exercised no discretionary authority over the Plan's assets in connection with the Mill Rock Transaction, they were not fiduciaries regarding "the particular activity in question" and cannot be liable under ERISA for claims challenging the transaction. *See, e.g.*, *Burke*, 42 F.4th at 723; *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 768 F.3d 284, 294-97 (3d Cir. 2014) (affirming dismissal of ERISA claims and noting plaintiff "must plead that the defendant was acting as a fiduciary when taking the action subject to complaint."); *Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 124 (3d Cir. 2013) (affirming defendant was not liable as fiduciary under ERISA where it did not exercise discretion over "challenged conduct"); *Ass'n of N.J. Chiropractors*, 2022 WL 45141, at *4 (dismissing ERISA claim where plaintiffs "fail[ed] to adequately allege that the [defendants] performed any discretionary role"); *Mugnai v. Kirk Corp.*, 843 F. Supp. 2d 858, 871 (N.D. Ill. 2012) (dismissing ERISA claims against ESOP trustees where complaint failed to allege sufficient "facts linking the Trustees' fiduciary obligations to the specific [challenged] act"); *Livick v. Gillette Co.*, 492 F. Supp. 2d 1, 7 (D. Mass. 2007) ("a named fiduciary is not liable for the breaches of one to whom power is delegated"), *aff'd sub nom. Livick v. The Gillette Co.*, 524 F.3d 24 (1st Cir. 2008); *In re Merck & Co., Inc., Sec. Deritative & Erisa Litig.*, 2006 WL 2050577, at *9 (D.N.J. July 11, 2006) (dismissing claim against plan

administrator where it had delegated authority to manage plan assets), *abrograted on other grounds, Dudenhoeffer*, 573 U.S. at 419-25. Accordingly, the claims against the Asbury Defendants should be dismissed.

Finally, Plaintiffs' prohibited-transaction claim fails for an additional reason. Section 406(b)(2) prohibits a fiduciary from acting on behalf of any party whose interests are adverse to the interests of the plan and its participants as part of a transaction involving plan assets. *See supra* at p. 17, n.5. But that is not what Plaintiffs allege happened here. Plaintiffs challenge the Mill Rock Transaction, in which the Plan sold its assets to Mill Rock Capital, an independent third party. Even if the Asbury Defendants were fiduciaries for purposes of the Mill Rock Transaction (they were not), and even if Plaintiffs were correct that the Asbury Defendants (instead of Defendant Brozen) had acted on behalf of the Plan in relation to that transaction (they did not), Plaintiffs' claim still fails because they do not allege that Asbury or Mr. Sook acted "on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b)(2). Therefore, Plaintiffs' Complaint fails based on the terms of the statute.

**D. Plaintiffs Fail to Plead Co-Fiduciary Liability**

Plaintiffs' allegations fail to state to a claim against the Asbury Defendants for co-fiduciary liability under ERISA Section 405(a), 29 U.S.C. § 1105(a).

"Following [] an allocation of fiduciary duties, the named fiduciary 'shall not be liable for an act or omission of such person in carrying out such responsibility' unless the allocation itself was a fiduciary breach or the named fiduciary committed a co-fiduciary breach as to the allocated responsibilities." *In re RCN Litig.*, 2006 WL 753149, at *7 (quoting 29 U.S.C. § 1105(c)(2)); *In re Merck & Co., Inc.*, 2006 WL 2050577, at *9 (same). Here, the Complaint alleges neither.

Moreover, Plaintiffs' co-fiduciary liability claim fails because it is "derivative of their direct breach of fiduciary duty claim," and as "Plaintiffs have not adequately alleged a breach of fiduciary duty by the [Defendants,] Plaintiffs' claim for co-fiduciary liability must be dismissed, as well." *Perrone v. Johnson & Johnson*, 2020 WL 2060324, at *19 n.12 (D.N.J. Apr. 29, 2020).[7] In any event, Plaintiffs cannot state a claim of co-fiduciary liability merely by parroting the language of Section 405(a) and repeating their allegations of an underlying fiduciary breach, which is all they do here. *See Renfro*, 671 F.3d at 324-25. For these reasons, Count IV should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Asbury Defendants respectfully request that the Court dismiss Counts I, III, and IV against them in their entirety and with prejudice.

[7] For reasons stated in Defendant Brozen's motion to dismiss, Plaintiffs fail to state a fiduciary-breach or prohibited-transaction claim in relation to Defendant Brozen. Therefore, any derivative co-fiduciary claim against the Asbury Defendants fails.

Dated: July 28, 2023

MORGAN, LEWIS & BOCKIUS, LLP

By: */s/ Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld
Allison Egan
Jared R. Killeen (*pro hac vice* pending)
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
jeremy.blumenfeld@morganlewis.com
allison.egan@morganlewis.com
jared.killeen@morganlewis.com

Deborah S. Davidson (*pro hac vice* pending)
110 North Wacker Drive
Chicago, IL 0606-1511
Telephone: (312) 324-1000
Facsimile: (312) 324-1001
deborah.davidson@morganlewis.com

*Attorneys for Asbury Defendants*

**CERTIFICATE OF SERVICE**

I, Jeremy P. Blumenfeld, an attorney admitted to practice in the District Court for the District of New Jersey, hereby certify that on July 28, 2023, a true and correct copy of the foregoing was served on counsel of record via this Court's ECF system.

By: */s/ Jeremy P. Blumenfeld*

Jeremy P. Blumenfeld
*Counsel for Asbury Defendant*